FILED
United States Court of Appeals
Tenth Circuit

June 18, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MOLLY RIZZI,

      Plaintiff - Appellant,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, a/k/a The
Hartford,

      Defendant - Appellee.

No. 09-2107

(D. N.M.)
(D.C. No. 1:07-CV-00814-JCH-RLP)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

Molly Rizzi brought suit challenging the termination of her long-term disability

benefits by Hartford Life and Accident Insurance Company (Hartford). The district court

concluded the denial was reasonable and granted judgment on the pleadings in favor of

Hartford. Rizzi appeals. We affirm.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id*.

## I.        BACKGROUND

Rizzi worked for Sprint/United Management Company (Sprint) as a "Customer Care Specialist" from July 20, 1998, until March 28, 2005.  (Appellant's App. Vol. IV Rizzi Rec. at 548.)[1]  She answered phone calls from customers and helped resolve customer complaints concerning their mobile phone service or equipment.  She often used a computer keyboard to access account information or input notes regarding customer concerns.

At an undefined point in time, Rizzi began experiencing pain "from [her] spine, neck, shoulder, down to [her] right arm to [her] right wrist, hand and fingers, or vice versa."  (Appellant's App. Vol. IV Rizzi Rec. at 523.)  She went to see Dr. Hung Quan (her primary physician at the time) about the pain on March 21, 2005.  A CT scan of her brain administered that day found nothing abnormal.  An MRI of her cervical spine administered four days later showed a "[t]iny right paracentral disk herniation of C3-4 without significant cord compression or impingement.[2]  No evidence of stenosis."[3]  (*Id.* at

---

[1] Appellant's Appendix comprises four volumes.  The first includes selective filings from the district court.  The remaining three include the administrative record.  They are labeled internally as "Rizzi Rec." and their page numbering restarts at 1.  Our citation to the appendices will include the entire citation to avoid any confusion.

[2] Herniation occurs when "a small portion of the [soft inner layer of the spine] pushes out through a tear in the [cartilage or disks] into the spinal canal.  This can irritate a nerve and result in pain, numbness or weakness in your back as well as your leg or arm."  Mayo Clinic Staff, Definition of "Herniated Disk", Dec. 20, 2008, http://www.mayoclinic.com/health/herniated-disk/DS00893 (last visited May 20, 2010).  The record does not indicate Rizzi's herniation was considered a likely cause of her pain.

[3] Stenosis is "a narrowing of one or more areas in your spine . . . [that] can cause pain or numbness in your legs, back, neck, shoulders or arms; [and] limb weakness . . . ."  Mayo Clinic Staff, Definition of "Spinal stenosis," Mar. 11, 2010,

401.)  Otherwise, her spine appeared normal.

On March 24, 2005, after being at work for "a few hours," Rizzi left because of "excruciating pain."  (Appellant's App. Vol. IV Rizzi Rec. at 525.)  She saw Dr. Quan again that day; he referred her to Dr. Edward Hui, a neurologist.  Over the next few months, Rizzi saw a number of doctors who attempted various forms of treatment including icing her neck, physical therapy, cortisone (steroid) shots, medial branch nerve blocks, various pain medications, and radio frequency neurotomy treatments.[4]  Rizzi was diagnosed with cervical facet syndrome[5] and myofascial pain.[6]

Rizzi participated in Sprint's Group Long Term Disability Plan (the Plan).  Hartford issued and administered the Plan which provided "loss of income protection if [an eligible employee] become[s] disabled from a covered accidental bodily injury, sickness or pregnancy."  (Appellant's App. Vol. II Rizzi Rec. at 5.)  This loss of income

---

http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited May 20, 2010).

[4] This is "a procedure to reduce back and neck pain" using "heat generated by radio waves to damage specific nerves and temporarily interfere with their ability to transmit pain signals."  Mayo Clinic Staff, Definition of "Radiofrequency neurotomy," Dec. 9, 2009, http://www.mayoclinic.com/health/radiofrequency-neurotomy/MY00947 (last visited May 20, 2010).

[5] Cervical facet syndrome involves neck pain brought on by the inflammation of the facet joints – the joints in the spine which connect the vertebrae.  *See* Robert E. Windsor, *Overview: Cervical Facet Syndrome*, emedicine from WebMD, Apr. 30, 2009, http://emedicine.medscape.com/article/93924-overview (last visited May 20, 2010).

[6] This is "a chronic form of muscle pain . . . center[ing] around sensitive points in your muscles called trigger points."  Mayo Clinic Staff, Definition of "Myofascial pain syndrome," Dec. 3, 2009, http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042  (last visited May 20, 2010). The pain can spread throughout the affected muscle.  It "has been linked to many types of pain, including headaches, jaw pain, neck pain, low back pain, pelvic pain, and arm and leg pain."  *Id.*

protection (otherwise known as disability benefits) pays eligible employees fifty percent of their income if they are unable to work due to a disability. Under the Plan, an employee is "disabled" when "prevented from performing one or more of the Essential Duties of [her] Occupation."[7]  (*Id.* at 19.) Hartford has "full discretion and authority to determine eligibility for benefits . . . ." (*Id.* at 18.)  In other words, it has the right to determine whether there is sufficient evidence to support a claim and can require the claimant "be examined by a doctor, vocational expert, functional expert, or other medical or vocational professional of [Hartford's] choice." (Appellant's App. Vol. II Rizzi Rec. at 15.)

On August 23, 2005, Rizzi applied for long-term disability benefits under the Plan.[8]  She claimed an inability to work because of "extreme pain and not being able to use [her] right extremities properly." (Appellant's App. Vol. IV Rizzi Rec. at 518.)  An attached cover letter stated "as of 07-14-05, and after Dr. Quan's review of [her] x-ray's [*sic*] . . . along with all the other Medical Diagnosis [*sic*] and Reports that I have Myofascial Pain Syndrome." (*Id.* at 523.)  She also attached a six-page log detailing her numerous doctor appointments and attempted treatments.

Rizzi's application included two forms completed by Dr. Quan. The first was entitled "Attending Physician's Statement of Disability" and was dated August 2, 2005.

---

[7] Benefit payments will terminate under the Plan in a variety of circumstances. Relevant here, they terminate when the employee no longer satisfies the Plan's definition of "disabled" and can perform the essential duties of her occupation.

[8] Rizzi had previously applied for and received short-term disability benefits under the terms of a separate plan. That plan and those benefits are not relevant here.

(Appellant's App. Vol. IV Rizzi Rec. at 522.)  In it, Dr. Quan prescribed no lifting or carrying in the right arm or hand, no reaching or working overhead with her right arm, and no keyboard or repetitive hand motions involving the right wrist.  However, he identified Rizzi as a suitable candidate for rehabilitation services with a "job modification [involving] less computer keyboard use[,] . . . [less] repetitive hand motion, [and] less lifting and carrying in the right hand." (*Id.* at 522.)  The second form was a Functional Assessment Tool[9] in which Quan noted Rizzi was incapable of performing full-time work.  His hand-written notes concluded he did not know when Rizzi would be able to return to work or what duties she would be able or unable to perform due to significant continuing "pain in the [right] shoulder, [right] elbow, [right] wrist and neck." (*Id.* at 531.)

Hartford began its preliminary examination of Rizzi's claim.  This included several conversations with Rizzi and her medical providers.  In one conversation, Rizzi said she was "in pain all the time" and while she wanted to return to work, "she cannot work anymore." (Appellant's App., Vol. II Rizzi Rec. at 114.)  She had enrolled in classes at a local community college but stated they were "not doing her any good." (*Id.*)  During another conversation, Rizzi reported "constant pain, which is sharp in quality"

---

[9] Hartford sends this form to a claimant's treating physician.  It requests information regarding the claimant's ability to return to full-time work, the doctor's office notes, any diagnostic results, all physical exam findings, all physical therapy summaries and all referring physician consultation reports generated since the beginning of the alleged disability.  It asks what activities the claimant is unable to perform and why, the duration for each continuing limitation, the doctor's treatment plan, and an estimated date the claimant can resume work activities.

preventing her ability to function and do household chores. (*Id.* at 109.) However, she was able to drive, shower, prepare meals, dress herself, and use a telephone with a headset.

Hartford obtained Rizzi's medical records, including those from Dr. Irwin Isaacs, a pain specialist to whom Rizzi had been referred. It interviewed Dr. Isaacs's nurse who confirmed Rizzi was being treated for Cervical Facet Syndrome. He reported that radio frequency neurotomy treatments significantly reduced Rizzi's reports of pain. She received her third treatment on October 18, 2005, and reported the next day that she was "doing better, no problems." (Appellant's App. Vol. II Rizzi Rec. at 106.) According to the nurse, Dr. Isaacs "expected that [Rizzi] will have significant improvement of symptoms or may be symptom free upon next evaluation [on November 15, 2005]." (*Id.* at 105.)

Hartford's internal review determined that "[b]ased on Dr. Isaacs's findings of Cervical Facet Syndrome, it is reasonable to support a functional impairment to [Rizzi's] job duties" and recommended approval of Rizzi's claim. (Appellant's App. Vol. II Rizzi Rec. at 104.) Because Dr. Isaacs believed Rizzi would be significantly better by mid-November, the internal review also recommended contacting Dr. Issacs and Dr. Richard Dvorak[10] at that time to check on Rizzi's condition. Hartford approved her application

---

[10] It is unclear from the record when Rizzi first saw Dr. Dvorak or even why she began seeing him. In January 2006 she identified him as her primary physician. Hartford's notes, dated October 20, 2005, reflect Rizzi had spoken with Dr. Dvorak about depression.

for disability payments on October 21, 2005.[11]

On January 24, 2006, Hartford conducted a follow-up interview with Rizzi to check on her condition and the effectiveness of her treatments. She reported her condition had deteriorated. Her neck, shoulder, right hand and wrist pains were consistently bad and accompanied by headaches. Middle back pain had also developed. She reported her average pain level was an 8-10 on a scale of 1 to 10.[12] She required multiple medications. The pain reduced her daily functions to the point she was homebound except for short excursions not exceeding one hour. Driving was nearly impossible because she could not turn her head and the medications made driving unsafe. She drove only to the store if necessary but was otherwise driven by others. She could not hold her neck up for more than one hour and did not walk her dog. Radio frequency neurotomy treatments continued but they no longer relieved her pain. Isaacs was no longer treating her; she only saw Dr. Dvorak. Rizzi believed she would never be able to work again.

Concluding Rizzi's "function is unclear and does not correlate with medical records received in file," Hartford referred the file to its Special Investigation Unit (SIU)

---

[11] The plan had a six-month benefit waiting period. As a result, Rizzi's benefits began on September 28, 2005, six months after her last day of work.

[12] Rizzi's self-reports of pain levels refer to a pain scale often used to establish the level of discomfort a patient is experiencing. In one example of this scale, the Wong-Baker Faces Pain Rating Scale, a response of 0 or 1 would indicate no pain, a 5 is more than a little pain, an 8 indicates a person "hurts a whole lot" and a 10 indicates it "hurts as much as you can imagine." Donna Wong and Lucille Whaley, Clinical handbook of pediatric nursing (2nd edition) 373, C.V. Mosby Company 1986 (1983), available at: http://painconsortium.nih.gov/pain_scales/Wong-Baker_Faces.pdf (last visited May 20, 2010).

to explore the validity of Rizzi's statements. (Appellant's App., Vol. III Rizzi Rec. at 413.) A SIU investigator followed Rizzi on February 7-8 and March 6-7 of 2006 and produced video, still photos, and a written description of her activities.

Rizzi was observed engaging in many of the day-to-day activities she was reportedly unable to do. She walked her dog multiple times, attended college classes (including a college writing course), ran errands, and drove herself between multiple locations while repeatedly away from her apartment for significantly more than an hour. On February 7, Rizzi was away from her apartment for more than 3 hours; on March 6, 2006, it was nearly 5 hours; and on March 7, 2006, nearly 3.5 hours. The investigator described Rizzi's actions on each of those days in detail and noted she "appeared to ambulate in a normal manner" and did not exhibit any outward manifestations of pain. (Appellant's App. Vol. IV Rizzi Rec. at 569, 583, 585.) She never received physical assistance from another person or appeared limited in her abilities. The investigation also included Rizzi's school transcript which showed she had earned high marks during a number of previous classes. However, Rizzi had never registered with the college's Special Services Office to receive special assistance in pursuing her studies.

The video surveillance shows approximately 32 minutes of the four-day surveillance. It records Rizzi getting in and out of her car, driving with both hands, walking to and from classes (including up and down multiple stairs), walking her dog and bending 90 degrees from the waist to gather its feces with a bag in her right hand, eating a sandwich and french fries with both hands, and clasping various items (including individual napkins, food, drinks, keys, and paper work) with her right hand. Her facial

expressions and actions reveal no evidence of pain. Rizzi did wear a brace on her right wrist during some, but not all of the period she was under surveillance. But her movements, including her gait while walking and navigating stairs, her ability to grasp and manipulate items of various weights and sizes in her right hand, drive with both hands (together and individually), and range of right arm movement, all appear normal.

Another investigator met with Rizzi at her home on April 25, 2006, to discuss her ongoing claim for benefits. She was not immediately told of the discrepancies between her reported abilities and the surveillance evidence nor was she shown the video. She was first asked to describe her physical condition and abilities. To this end, she and the investigator formulated a written statement. It notes Rizzi is only able to walk a couple blocks; travelling this distance takes approximately 15-20 minutes because her gait is slow due to pain. After a couple blocks, her pain increases to an 8 or 9 and a rest must be taken. Standing is limited to 15 minutes; she must then sit because of a headache or pain levels which increase to 8 or 9. She is "unable to carry anything" with her right hand or arm and she can lift only 10 pounds with her left arm. (Appellant's App. Vol. IV Rizzi Rec. at 600.) Pain levels increase to 8, 9, or even 10 when carrying anything with her left arm. Managing stairs is possible (descending is more difficult than ascending) but pain levels increase to 8, 9 and even 10. Driving is possible for approximately 20 minutes but she is unable to turn her head or use both hands on the steering wheel. Her right hand has no grip strength and she experiences numbness in the ends of the fingers. On a good day, her average pain level is 5. Rizzi was given the chance to make changes, deletions, modifications or additions to the statement as she felt necessary. She attested it was true

- 9 -

and accurate.

The interview lasted 3.5 hours. Rizzi was given the opportunity to rest whenever needed. Throughout the interview, Rizzi "appeared slow and sluggish," displayed pain indicators by "moaning and crying during the interview," "complained of being in pain on her right side," "moved her right arm and hand very little," and displayed "cognitive and concentration difficulties" including "trouble at times formulating her thoughts" or "trouble concentrating due to the pain that she was in." (Appellant's App., Vol. IV Rizzi Rec. at 596.) The investigator noticed Rizzi "got up and down, from seated to a standing position, approximately five times . . . without any difficulty." (*Id.*)

After the joint statement was completed, the investigator told her of the surveillance and played the video. Rizzi responded "she was readily capable of performing those activities documented on film, and this represented her above normal level of functionality." (Appellant's App. Vol. IV Rizzi Rec. at 595.) Hartford also sent a copy of the video to Dr. Dvorak for review. He responded, "I have seen nothing on your tapes that change the clinical status of Ms. Rizzi . . . . I suggest an occupational medicine evaluation by someone who is not associated with your company . . . ." (Appellant's App., Vol. III Rizzi Rec. at 338.)

Hartford did seek an evaluation of Rizzi's medical file by an independent consultant. It forwarded the file to the Medical Advisory Group LLC (MAG) for review by one of MAG's physicians. MAG assigned the file to Dr. F. B. Dibble. He reviewed the medical records, examination notes from Drs. Dvorak, Issacs, Quan and Hui, Rizzi's accounts of her pain and the surveillance evidence. Dr. Dibble also conducted a

telephone interview with Dr. Dvorak. Dr. Dvorak said he had not seen any physical evidence of muscular atrophy,[13] weakness, discoordination, complex regional pain syndrome, or carpal tunnel syndrome in Rizzi. Instead, he confirmed his diagnoses were based on Rizzi's self-reported pain and her self-reported limitation of activities. He had not undertaken any objective assessment of her physical capabilities and he could not define her abilities to work without a more formal occupational therapy appraisal.

Dr. Dibble then compiled his report to Hartford which noted Rizzi "has been inconsistent in her description of her pain complaints and their duration, as well as her physical capabilities . . . ." (Appellant's App., Vol. III Rizzi Rec. at 329.) He concluded "Rizzi is not restricted from performing full-time work. There is no evidence of any specific physical impairment or limitation that should require any particular restriction relative to workplace activities." (*Id.*)

Hartford terminated Rizzi's disability benefits on June 7, 2006, because she "no longer satisf[ied] the definition of disability according to the policy." (Appellant's App., Vol. II Rizzi Rec. at 133.) Its termination letter cited the Plan's definition of "Disability or Disabled" and identified multiple sources of information it relied upon in determining

---

[13] Muscular atrophy is a wasting or loss of muscle tissue due to disuse or reduced use. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003188.htm (last visited May 20, 2010). In response to the video surveillance, Rizzi noted she does "some home exercises that I have gotten from physical therapy which help me keep my muscle becoming atrophy." (Appellant's App., Vol. IV Rizzi Rec. at 594.) There is no other evidence in the record to indicate Rizzi undertakes any form of home exercise, any description of these exercises, or how they would stop atrophy in muscles she reportedly cannot use. It is particularly notable that Dr. Dvorak did not mention these exercises when repeatedly asked about Rizzi's muscular atrophy and muscular abilities.

she was no longer disabled.  These sources included: Dr. Quan's Attending Physician statement, a telephone interview with Rizzi, her job description, video surveillance, information from her college, the statement she compiled with the investigator on April 25, 2006, medical records and other information provided by Dr. Dvorak, and the independent record reviews performed by Dr. Dibble.  Hartford acknowledged Dr. Quan's observations that Rizzi was unable to carry anything or reach with her right arm or hand and Rizzi's statements indicating constant pain and the inability to use her right hand.  It reviewed in detail Rizzi's personal complaints of pain and limitation and Dr. Dvorak's medical diagnoses, response to the surveillance, and statements to Dr. Dibble.  However, it also noted her job description "requires no lifting or carrying, continuous sitting, occasional walking, no balancing, stooping, kneeling, crouching, crawling, fine manipulation or grasping."  (*Id.* at 134.)  The letter also discussed the surveillance evidence and Dr. Dibble's objective review of her file.  Ultimately, it concluded:

> [T]he medical, investigative, and vocational information on file no longer supports that you are totally disabled from your Occupation.  While we respect Dr. Dvorak's opinion that you are unable to work and would require an occupational evaluation to determine capabilities for employment, the information currently on file shows a level of function that would be consistent with your ability to return to your own occupation.  In addition, as concluded by an Independent Record Review, the medical information on file does not show any evidence warranting any physical limitations.  As a result, you no longer satisfy the definition of disability according to the policy and your benefits have been terminated.

(*Id.* at 136.)

Rizzi administratively appealed this denial of benefits to Hartford.  She challenged Hartford's use of a non-examining physician (Dr. Dibble), its conclusion she could

- 12 -

continue her usual occupation, the relevancy of the surveillance evidence and school records, and Hartford's failure to properly develop the record and document the extent of her limitations. She also supplemented the record with additional information which included a "Medical Source Statement Concerning the Nature and Severity of [Rizzi's] Physical Impairment." (Appellant's App. Vol. III Rizzi Rec. at 280.) This form, which was created by Rizzi's attorney and completed by Dr. Dvorak, stated Rizzi was unable to perform sustained sedentary work on a regular basis. On November 15, Hartford informed Rizzi it had received her appeal and it would respond within 45 days as required by the Employment Retirement Income Security Act of 1974 (ERISA).

In reviewing her appeal, Hartford observed that Dr. Dvorak's notes say Rizzi was scheduled to undergo a neurology consultation and nerve conduction study in June 2006. Because the file contained no record of these tests, Hartford asked Rizzi's attorney for the results of these procedures. Rizzi's attorney agreed to provide this. Hartford received the additional medical information on December 11, 2006, but it did not include anything relating to the neurology consultation or nerve conduction study. Hartford immediately contacted Rizzi's attorney who assured Hartford all available medical files had been provided. Because the appeal file had been supplemented with pertinent information, Hartford determined Rizzi's appeal was perfected on December 11, 2006, and notified her a determination would be provided within 45 days.[14]

---

[14] The December 11, 2006 letter does not reference ERISA. It informed Rizzi the receipt of her additional medical information is considered perfecting her appeal and that Hartford has 45 days from the date the additional information was received to render its decision.

- 13 -

Hartford arranged for a second independent medical review of Rizzi's medical history with University Disability Consortium (UDC). A UDC consultant, Dr. Jerome Siegel, reviewed Rizzi's entire file (with the exception of Dr. Dibble's report). Dr. Siegel spoke at length with Dr. Dvorak on multiple occasions, reviewed all of Rizzi's medical records, and the surveillance evidence. He issued a report on January 16, 2007. It summarized the conversations with Dr. Dvorak and the medical records in detail. Dr. Dvorak again acknowledged Rizzi manifested no physical symptoms typical to complex regional pain syndrome[15] (such as muscle atrophy, changes in skin or nail coloration, or hair loss), and objective medical tests revealed no obvious reason for her reported pain. Nonetheless, Dr. Dvorak confirmed his "overall diagnoses were chronic daily headaches, anxiety/depression, occipital neuralgia,[16] and right hand pain." (Appellant's App., Vol. III Rizzi Rec. at 204.) He said Rizzi "was having financial problems[,] . . . her disability coverage had been denied . . . [and] [t]here was difficulty in getting her to receive [multiple medications] . . . . [She also had] significant psychological overlay because of

[15] This is "an uncommon, chronic condition that usually affects [an] arm or leg" and is "marked by intense burning or aching pain." Mayo Clinic Staff, Definition of "Complex regional pain syndrome," Mar. 31, 2009, http://www.mayoclinic.com/health/complex-regional-pain-syndrome/DS00265 (last visited May 20, 2010).

[16] "Occipital neuralgia is a distinct type of headache characterized by piercing, throbbing, or electric-shock-like chronic pain in the upper neck, back of the head, and behind the ears, usually on one side of the head." National Institute of Neurological Disorders and Stroke, Occipital Neuralgia Information Page, last updated Dec. 14, 2009, http://www.ninds.nih.gov/disorders/occipitalneuralgia/occipitalneuralgia.htm (last visited May 20, 2010). The pain may be caused by irritation or injury to the nerves. In many cases, however, no cause can be found. It is not a life-threatening disease and many individuals improve with treatments involving anti-inflammatory medications, muscle relaxants, heat, and rest. *See id.*

her ongoing pain." (*Id.* at 205.) The doctors also discussed the surveillance evidence. Dr. Dvorak reiterated the video did not change his opinion that Rizzi's pain was real but admitted he had not addressed her ability to resume sedentary or administrative work.

For Dr. Siegel, the lack of objective medical evidence coupled with the surveillance evidence raised questions concerning Rizzi's probity when self-reporting the level of her pain and functionality of her right arm. He determined some physical restrictions may be appropriate (including alternating sitting and standing, limiting repetitive use of her upper right arm, and limited typing) but "the information presented does not substantiate why Ms. Rizzi could not return to sedentary to light physical demand work activities as would be expected as part of her regular work activities at Sprint." (Appellant's App., Vol. III Rizzi Rec. at 213.) Hartford considered this report together with the entire administrative record and denied Rizzi's appeal on January 18, 2007. It concluded:

> Based on the totality of the information presented that included Appeal's independent review of the evidence presented, the review and opinion of the Medical Consultant's of whose opinion's [sic] and expertise we further relied on, Ms. Rizzi's own treating physician's opinion, the claimant's self-reported and observed activities of daily living, the medical evidence is not commensurate with findings on physical/clinical examination that would reasonably be expected to cause functional restrictions/limitations that would preclude Ms. Rizzi from performing her regular occupational work activity. While we do not disagree that she may have symptoms and a medical condition that presents some functional restrictions/limitations, again, the medical findings of fact do not provide an explanation for her complaints and further that she would be precluded from performing one or more of the essential duties of her occupation

(*Id.* at 224.) Upon request, Hartford forwarded Dr. Siegel's report to Rizzi but refused

her attempt to supplement the record with a response by Dr. Dvorak.[17]

Rizzi sought review of Hartford's denial of long-term disability benefits in state court. Hartford removed the case to federal court. Rizzi moved for judgment on the administrative record and Hartford countered with a motion for a bench trial on the papers (which the court treated as a motion for judgment on the pleadings). The district court granted Hartford's motion and denied Rizzi's.

## II.    DISCUSSION

Rizzi contends the district court erred in granting Hartford's motion for judgment on the pleadings. She argues Hartford's denial of benefits was arbitrary and capricious because of its: (1) use of biased outside consultants; (2) reliance on surveillance evidence; (3) disregard of her subjective complaints of pain; (4) failure to consider her anxiety and depression as a separate cause of disability; and (5) violations of controlling regulations. She also argues these individual issues collectively demonstrated Hartford was blinded by a conflict of interest. She argues the district court erred in the standard of review it applied to Hartford's decision.

"The district court's determination of whether an ERISA benefits decision is arbitrary and capricious is a legal conclusion subject to *de novo* review." *Caldwell v. Life Ins. Co. of N. Am.,* 287 F.3d 1276, 1282 (10th Cir. 2002). On appeal, we review the plan administrator's decision to deny benefits to a claimant, not the district court's ruling. *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009). Because the Plan affords Hartford the "authority to determine eligibility for benefits or to construe

---

[17] The district court also refused to consider this information.

- 16 -

the terms of the [P]lan, we review the decision for abuse of discretion." *Id.* (quotations omitted).

In the ERISA context, the abuse of discretion and the arbitrary and capricious standards of review are interchangeable. *See Weber v. Gen. Elec. Group Life Assurance Co.,* 541 F.3d 1002, 1010 n.10 (10th Cir. 2008). We will uphold an administrator's decision "so long as it is predicated on a reasoned basis." *Adamson v. Unum Life Ins. Co of Am.,* 455 F.3d 1209, 1212 (10th Cir. 2006). "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one . . . . [O]ur review inquires whether the administrator's decision resides somewhere on a continuum of reasonableness -- even if on the low end." *Id.* (quotations omitted). We review Rizzi's individual complaints under this standard.

Rizzi also argues that the individual issues she identifies demonstrate Hartford's decision should be entitled to less deference because its serves as both plan administrator and payee of benefits. It is not an uncommon scenario where "the entity that administers [an ERISA] plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). In such circumstances there is an inherent conflict of interest. *Id.* This conflict of interest is "a factor" which "should prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 2351. As the Supreme Court subsequently explained, *Glenn* "held that, when the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face

- 17 -

of a conflict." *Conkright v. Frommert*, 130 S. Ct. 1640, 1646 (2010). Thus the conflict is considered as one of many case-specific factors in determining whether the administrator's decision was an abuse of discretion. *Glenn*, 128 S. Ct. at 2350; *Holcomb,* 578 F.3d at 1192. "The importance we attach to the existence of a conflict of interest is proportionate to the likelihood that the conflict affected the benefits decision." *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009), *cert. denied*, No. 09-1169), --- S. Ct. ---, 78 USLW 3581 (U.S. June 1, 2010). The conflict is entitled to greater weight "where circumstances suggest a higher likelihood that it affected the benefits decision" and less weight where the administrator has minimized the risk that the conflict would impact the benefits decision. *Glenn,* 128 S. Ct. at 2351.

Rizzi claims the individual improprieties, individually and collectively, illustrate how Hartford's inherent conflict resulted in an arbitrary and capricious benefits decision. We disagree.

A.     Bias of Medical Consultants

Rizzi claims the frequency with which Hartford engages the services of MAG and UDC provide these companies with "an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (quotations omitted).[18] Therefore, we should accord little, if any, weight to their doctors' opinions.

---

[18] Rizzi fails to note the *Nord* case considered a wholly separate question from the one raised in this case -- whether a personal physician is entitled to greater deference than a non-treating physician; the Court concluded he is not. *Nord*, 538 U.S. 831. Nonetheless, the Court even-handedly countered the quote relied upon by Rizzi,

To support her allegations of bias by UDC and MAG physicians, Rizzi relies on *Caplan v. CNA Financial Corp., et al.*, 544 F. Supp.2d 984 (N.D. Cal. 2008).[19]

In *Caplan*, the plaintiff applied for long-term benefits pursuant to a benefits plan administered by Hartford (who was also a named defendant in the case). He had suffered a lumbar spine injury and an injury to the ulnar nerve in his right arm in 1998. *Id.* at 986. In 1999 or early 2000 he began working for CNA and in 2003 injured his cervical spine and began experiencing problems with his hands. *Id.* After attempting several methods of accommodation and engaging in numerous consultations with physicians, Caplan applied for long-term disability benefits. *Id.* at 987. Hartford denied his claim and subsequent appeal based solely on a UDC physician's opinions. *Id.* at 989. In seeking to overturn Hartford's denial of benefits, Caplan claimed not only that the relationship between Hartford and the UDC physician called into question the physician's trustworthiness, but also that the physician's medical opinion was itself unreasonable.

To support his argument, Caplan provided admissible evidence showing UDC obtained nearly seventy-five percent of its revenue from Hartford's claim reviews and had reduced its hourly rates for Hartford-related work from $300 an hour to $225 as part

recognizing a claimant's treating physician also has the potential for bias. *Id.* at 832 ("And if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'").

[19] Before the district court, Rizzi cited 41 cases where Hartford reportedly employed the services of MAG or UDC arguing this "shows a strong and ongoing relationship between Hartford and each medical consultant." (Appellant's App., Vol. I at 40.) The cases are currently between three and eight years old and are not cited on appeal. We do not consider them.

of a "volume discount type arrangement." *Id.* UDC's gross revenue had increased between 50 and 100 percent after it signed its contract to provide services to Hartford; Hartford had paid UDC more than $13 million between 2002 and 2008 for consulting services. *Id.* He also presented evidence that the physician who reviewed his claim had performed chart reviews for UDC "producing 217 evaluations for 202 Hartford claimants between January 1, 2005, and September 30, 2007 . . . . [and] of these 202 claimants, he found that 193 of them were capable of working full-time in some type of position under appropriate restrictions." *Id.* at 990.

The court found Caplan had shown "UDC ha[d] an incentive to provide [Hartford] with reports that will increase the chances that Hartford will return to UDC in the future." *Id.* at 991. This bias led the court to view Hartford's benefit decisions "with commensurate skepticism" and caused it "serious doubt [as to] the neutrality of [Hartford's] decision-making process." *Id.* at 992. The court also expressed significant concern over the unreasonableness of the reviewing physician's conclusions and his personal history with Hartford. Rizzi demands similar skepticism of Drs. Dibble and Siegel because Hartford regularly contracts with their employers.

While we do not quarrel with the result reached by the California district court, we cannot presume bias on the part of UDC based upon facts presented to another court more than two years ago (much less on the part of MAG which was not involved in *Caplan*).[20] Rizzi identifies no admissible evidence of a significant financial incentive by

---

[20] These facts are not in the record and Rizzi has not asked us to take judicial notice of them as evidence of the relationship between Hartford and UDC. Even if

MAG or UDC to decide claims in Hartford's favor. Even more telling, Rizzi presents no evidence of an inherent bias or unreasonableness by Dr. Dibble or Dr. Siegel. The skepticism expressed in *Caplan* was due in large part to the physician's individual history with Hartford and the unreasonableness of his conclusions. That physician "discounted a wealth of evidence" supporting Caplan's claim including the results of "multiple MRIs" and objective functional capacity tests. *Id.* at 992.

General accusations of bias against Dr. Dibble and Dr. Siegel do not provide a reason to doubt what otherwise appear to be competent and reasonable opinions. *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601 n.14 (5th Cir. 1994) (rejecting a similar sweeping argument of bias based solely upon a consultant's employment with an agency which contracts regularly with a plan administrator). Drs. Dibble and Siegel independently noted Rizzi's numerous medical examinations failed to identify any objective signs of disability -– a conclusion Rizzi does not challenge. Rather, Rizzi's disability claim (and her physicians' diagnoses) relied solely upon her subjective complaints of pain. The surveillance evidence showed Rizzi performing a variety of daily activities for significant periods of time without any indications of pain, distress, or difficulty. Drs. Dibble and Siegel each considered and addressed all subjective and

---

requested our ability to take judicial notice of the claimed facts is questionable. "Judicial notice is appropriate where a matter is verifiable with certainty. It replaces the evidentiary procedure that would otherwise be necessary to establish adjudicative facts that are generally known or capable of accurate and ready determination by resort to reliable sources." *York v. Am. Tel. & Tel. Co.*, 95 F.3d 948, 958 (10th Cir. 1996) (citation and quotations omitted). These facts do not appear to be readily verifiable by public records or reliable sources, particularly because much may have changed in the time since they were admitted as evidence.

objective evidence in the record and separately arrived at the same conclusion. Hartford

did not abuse its discretion in relying on their opinions simply because they are employed

by MAG and UDC, respectively.

Our cases recognize the hiring of independent physicians (defining "independent"

as not including "[a plan administrator's] own on-site physicians and nurses") to review a

medical file actually *decreases* the importance of a plan administrator's inherent conflict

of interest because they are not directly employed by the administrator. *Holcomb*, 578

F.3d at 1193; *see, e.g., Loughray v. Hartford Group Life Ins. Co.*, No. 07-1189, 2010 WL

618032, at *9 (10th Cir. Feb. 23, 2010) (unpublished) (no abuse of discretion in relying

on one outside physician against whom no evidence was presented undermining his

independence).[21] This is not to say that *any* hiring of an outside physician to review a

claim of disability will automatically entitle a plan administrator to greater deference.

Rizzi presented no evidence to suggest the medical opinions of Drs. Dibble or Siegel

were suspect or that a significant fiscal relationship existed between Hartford and the

doctors or their employers. We have no reason to depart from our previous holdings.

Hartford's reliance on independent physicians to review her benefits claim was not

unreasonable or an abuse of its discretion.

B.     Reliance on surveillance evidence

Rizzi also contends Hartford's "surreptitious surveillance is [not] of any value

---

[21] Unpublished opinions are not binding precedent. 10th Cir. R. 32.1(A). We mention *Loughray* and other unpublished cases as we would any other non-binding source, persuasive because of its reasoned analysis.

when it fails to demonstrate any ability to perform work activity on a continuous basis." (Appellant's Opening Br. at 38.) She cites three cases to support this argument: *Morgan v. Unum Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003); *Osbun v. Auburn Foundry, Inc.,* 293 F.Supp.2d 863, 871 (N.D. Ind. 2003); and *Holoubek v. Unum Life Ins. Co. of Am.*, 2006 WL 2434991 at *2-3 (W.D. Wis. Aug. 22, 2006). None of these cases offer the support Rizzi seeks. In each case, the plan administrators violated the terms of their plan or disregarded medical evidence and relied solely on surveillance evidence to support the denial of benefits.

In *Morgan*, the plan administrator initially paid long-term benefits based in large part on cognitive disabilities supported by medical evidence. The administrator ultimately terminated benefits after an in-house physician observed surveillance evidence showing the claimant exercising and engaging in routine daily activities. However, the administrator had known he engaged in these activities when approving his initial claim. 346 F.3d at 1177-78. The Eighth Circuit said the surveillance evidence "revealed nothing new and was not substantial evidence supporting UNUM's decision to discontinue Morgan's disability benefit." *Id.* at 1178. Furthermore, the opinion of the plan administrator's doctor, which was based on the surveillance evidence, "was at best tangentially relevant to Morgan's circumstance of being disabled by the *cognitive deficits*" he suffered due to his medical condition. *Id.* at 1178 (emphasis added).

In *Osbun*, the court rejected the administrator's "decision to terminate benefits . . . *with no supporting medical evidence*." 293 F.Supp.2d at 870 (emphasis added). More specifically, the denial of benefits concluded

> a mentally retarded, illiterate, partially blind, partially deaf, arthritic man with arteriosclerotic heart disease, thyroid insufficiency, and high blood pressure is capable of gainful employment, simply because he performed 1.5 hours of light physical tasks over the course of two days, and in spite of three medical reports finding total disability. This conclusion is downright unreasonable.

*Id.* at 871 (quotations omitted).

The third case, *Holoubek,* involved a termination of benefits after surveillance observed the claimant "engaged in numerous activities which were inconsistent with his reported activity level and limitations." 2006 WL 2434991 at *11. On review, the court acknowledged the surveillance created disparities between the record and the claimant's reported abilities. However, it ultimately rejected the administrator's denial of benefits on narrow grounds -- the record did not include any *specific* finding that the claimant "could perform the material and substantial duties of *his* occupation" as required under the terms of the plan. *Id.* at *12 (emphasis added).

Rizzi alleges the surveillance showing her ability to manage some daily tasks does not demonstrate she can manage a full-time job. She argues "there is no requirement on the disabled to become inert in order to avoid having their disability benefits denied," quoting *Crespo v. Unum Life Ins. Co. of Am.,* 294 F.Supp.2d 980, 996 (N.D. Ill. 2003). While this is true, Hartford relied on more than surveillance evidence in denying Rizzi's claim; it also considered Rizzi's subjective complaints of pain, medical opinions of Drs. Dibble and Siegel (who spoke with Dr. Dvorak on multiple occasions), and the results of objective medical tests in her file. For example, Dr. Siegel acknowledged in writing that "the videotape surveillance does not tell the entire story . . . ." (Appellant's App. Vol. III

Rizzi Rec. at 242.) He noted Rizzi exhibits "no indication . . . of diffuse muscle atrophy or wasting, shiny or atrophic skin, allodynia, problems with her skin and nails, abnormal temperature or color changes in her right upper extremity, or marked pain behavior such that she is unable to do gripping, grasping, or using her right upper extremity." (*Id.* at 239.) This corresponded with Dr. Dibble's observation that there was "no evidence of any muscular atrophy, reflex impairment, impaired range of motion of her joints, or peripheral circulation . . . ." (*Id.* at 329.) In rejecting Rizzi's request for reconsideration, Hartford "considered the reported symptoms and to what extent the findings on physical examination and testing results confirm the symptoms." (Appellant's App., Vol. II Rizzi Rec. at 222.)

Of course Hartford gave some weight to the surveillance evidence. But it "also considered Ms. Rizzi's self-reported and observed activities of daily living which provide[d] a picture of function in spite of any medical condition(s) . . . . [and also considered] the physical demands of her occupational work activity . . ." (*Id.* at 222-23.) As discussed above, it also considered the medical opinions of Drs. Dvorack, Dibble and Siegel. Reliance on surveillance evidence *in conjunction with* medical evidence is not improper. Rizzi identifies no case law and we have found none which holds the denial of a disability claim based on surveillance evidence in conjunction with objective medical evidence or opinions of independent physicians is unreasonable or an abuse of discretion.

C.     Disregard of Rizzi's subjective complaints of pain

Rizzi also alleges Hartford failed to give proper consideration to her subjective reports of pain. She compares her diagnosis of occipital neuralgia to cases involving

- 25 -

fibromyalgia for which the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of the ailment's severity. *See Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (noting "fibromyalgia presents a conundrum for insurers and courts evaluating disability claims" because, among other things, no objective test exists to identify the disease) (quotations omitted). In such cases, a plan administrator's medical inquiry naturally involves questions regarding the claimant's credibility. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 878 (9th Cir. 2004) ("[T]he patient's pain reports for their diagnoses . . . cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain.") *overruled on other grounds by*, *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006) (en banc).

In considering Rizzi's complaints of disabling pain, the lack of any tangible evidence of it is important. Objective medical testing revealed no cause for her condition or confirmation of her limitations. Her own treating physicians indicated Rizzi should be functioning at a higher level. Dr. Isaacs predicted a nearly pain-free existence following Rizzi's subjective reports of *reduced* pain after radio frequency neurotomy treatments. Dr. Dvorak confirmed to Drs. Dibble and Siegel he saw no physical symptoms of decreased function in Rizzi. And no other treating physicians documented any physical symptoms (like muscle atrophy, hair loss or nail discoloration) associated with an inability to mobilize or use her extremities.

Hartford then looked to the surveillance evidence in an attempt to corroborate

Rizzi's complaints. But surveillance showed Rizzi functioning with no visible signs of disabling pain. We find it noteworthy the surveillance occurred for two days in February and two days in March. Her capability of performing significant activity without indication of pain on separate occasions decreases the likelihood of coincidence.

Given the opportunity to respond to this evidence, Rizzi provided no tangible support of her claim -- no neurological study, no additional tests, and no supporting documentation of witnesses to her physical limitations. A plan administrator need not ignore reliable medical evidence in deference to subjective reports; nor is it unreasonable to expect some supporting evidence to buttress a claim of disability. *See Holcomb*, 578 F.3d 1194 (no abuse of discretion when independent medical evidence indicated claimant "was fit for multiple gainful occupations that reasonably matched her education, training, and experience"); *Meraou v. Williams Co. Long Term Disability Plan*, 221 Fed. App. 696, 706 (10th Cir. 2007) (unpublished) (rejecting wholly subjective complaints of pain without further medical evidence in concluding denial of ERISA benefits was not unreasonable); *Frizzell v. Shalala*, 37 F.3d 1509, 1994 WL 562026 at *3 (10th Cir. Oct. 13, 1994) (unpublished) (where none of claimant's doctors stated her fibromyalgia was disabling, the denial of ERISA benefits was not unreasonable). Hartford's consideration of the surveillance evidence was not unreasonable.

1.      Failure to consider anxiety and depression as a separate cause of disability

Rizzi argues Hartford failed in its duty to consider the possibility that anxiety and depression made her unable to work. For support, she cites *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792 (10th Cir. 2004). In *Gaither* we noted a plan administrator "cannot

shut their eyes to readily available information when the evidence in the record suggests the information might confirm *the beneficiary's theory of entitlement* and when [the administrator has] little or no evidence in the record to refute that theory." *Id.* at 807 (emphasis added). An administrator may have a duty to independently request more information from the claimant if the "information is needed to make a reasoned decision . . . ." *Id.* (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F. 3d 625, 635 (10th Cir. 2003)). However, it has no duty to "pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other." *Id.*

While Rizzi's theory of entitlement is not limited solely to her initial application for benefits, it provides the clearest statement of her alleged qualification for disability payments. Specifically, she was "unable to perform [her] job duties due to extreme pain [and] discomfort. Extreme pain and not being able to use [her] right extremities properly." (Appellant's App., Vol. IV Rizzi Rec. at 518.) She later explains her diagnosis is myofascial pain syndrome. Her six-page log of symptoms, doctor appointments, and other information did not suggest depression, anxiety, or any other psychological condition made her unable to work. One sentence in her log mentioned depression; it said "Dr. Quan felt I was very depressed *because of my disability* and prescribed [medication]." (*Id*. at 529 (emphasis added).)

Depression was not raised by Rizzi until her administrative appeal, when she said she "became and continue[s] to be disabled because of . . . anxiety and depression . . . ."

(Appellant's App. Vol. III Rizzi Rec. at 271.)   Rizzi argues Dr. Dvorak repeatedly noted she was depressed and Hartford should have investigated it further.  Dr. Dvorak noted Rizzi was "just very frustrated that she is no[t] able to get back to work" (*id.* at 403 (March 2006)); she "remains extremely frustrated with this ongoing pain and the inability to get a firm diagnosis and to get better" (*id.* at 314) (May 2006)); and she "continue[s] to have a significant amount of depression" and needs to have her Cymbalta prescription increased "for pain modification . . . [and] depression" (*id.* at 265 (July 2006)).  The most extensive treatment notes from Dr. Dvorak relating to depression are from August 2006 where he indicated anxiety and depression were secondary diagnoses to her pain issues.  He explained Rizzi was having "significant psychological overlay . . . because of the ongoing pain" and was distraught because insurance no longer covered particular medications.  (*Id.* at 258.)  In October 2006, Dr. Dvorak's notes indicate Rizzi was no longer taking Cymbalta because she "felt more depressed on it."  (*Id.* at 256.)  At no time did Dr. Dvorak's notes reflect that her depression was debilitating or a separate issue worthy of consideration.

Rizzi also contends her April 25, 2006, statement of abilities written with the investigator identifies symptoms of depression which Hartford ignored.  The statement says she cannot concentrate and has headaches, fatigue, and insomnia.  More specifically, Rizzi states she is "not able to concentrate *because of the pain and headaches*" and is "not able to sleep well *because of the pain* . . . [and] feel[s] fatigued during the day." (Appellant's App. Vol. III Rizzi Rec. at 377 (emphasis added).)

No one disputes Rizzi was depressed because of her issues with pain.  But the

statements noting this fact in the record are equally as important for what they do not say— that she could not work because of her depression. At one point, Dr. Quan said Rizzi's psychiatric state is "[e]ssentially good functioning in all areas. Occupationally and socially effective." (Appellant's App. Vol. IV Rizzi Rec. at 522.) Dr. Dvorak repeatedly and explicitly identified anxiety or depression as a *secondary* diagnosis caused by her financial instability and pain. Even the statements in the April 25 report do not indicate Rizzi was unable to work because of these issues or that they were worthy of investigation.

Our focus in *Gaither* limited the administrator's duty to investigate to the issues identified in "the claim" or "the beneficiary's theory of entitlement." *Gaither*, 394 F.3d at 807. Hartford is not expected to conceive, consider, and investigate every possible theory of entitlement for Rizzi; it must only examine the theory (or theories) she asserts. Because Rizzi never claimed her anxiety or depression made her unable to function within her job separate from the primary diagnosis of pain, Hartford did not abuse its discretion in failing to create that theory for her.

2.      Alleged Regulatory Violations

Finally, Rizzi alleges Hartford's bias is demonstrated by its violations of ERISA regulations. Specifically, she alleges violations of 29 CFR § 2560.503-1(h)(2)(ii)-(iv) (opportunity to comment and disclosure of documents)[22] and 29 C.F.R. § 2650.503-

_____

[22] 29 CFR § 2560.503-1(h)(2)(ii)-(iv) requires the administrator to:

(ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

1(g)(i)-(ii) (requiring administrator provide a claimant with the specific reasons for the

denial of benefits and the specific plan provisions upon which the denial was based).[23]

These arguments are without merit. First, Hartford clearly identified the specific

(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section; [and]

(iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

"Documents" as used in subsection(h)(2)(iii) is later defined to include documents "relied upon in making the benefit determination; [or] . . . submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination." 29 CFR § 2560.503-1(m)(8)(i)-(ii).

[23] Rizzi also alleges Hartford violated 29 CFR § 2560.503-1(f)(3) which says in relevant part: "In the case of a claim for disability benefits, the plan administrator shall notify the claimant . . . of the plan's adverse benefit determination within a reasonable period of time, but not later than 45 days after receipt of the claim . . . ." Rizzi argues the December 11, 2005, letter stating Hartford would respond to the appeal within 45 days was an improper extension of time under the regulations. We do not consider this issue. The record reveals no evidence this objection was raised by Rizzi upon receipt of the letter. Thus, she waived the issue by not allowing Hartford the opportunity to correct any error it may have made.

In any event, the regulation allows the 45-day period to be extended for 30 days if the administrator (1) "determines that such an extension is necessary due to matters beyond the control of the plan;" and (2) "notifies the claimant, prior to the expiration of the initial 45-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." 29 CFR § 2560.503-1(f)(3). Arguably, both criteria were satisfied when Hartford communicated with Rizzi's attorney about what it believed were missing records (including the neurological study and nerve conduction study) and later announced the date by which its review would be completed. Furthermore, extending the time to allow submission of additional medical records actually benefited Rizzi by enlarging the administrative record.

reasons it denied Rizzi's claim and the specific plan provisions involved. The original determination letter quoted the Plan's definition of disabled and cited numerous documents in her file as the bases for its decision she no longer qualified under that definition.[24] Hartford then discussed her complaints of pain and disability and "the medical, investigative, and vocational information on file" before concluding "the information . . . shows a level of function that would be consistent with your ability to return to [work]" and "the medical information on file does not show any evidence warranting any physical limitations." (Appellant's App. Vol. II Rizzi Rec. at 136.)

Second, Rizzi was given full opportunity to supplement the record during her administrative appeal. Hartford specifically requested the neurological and nerve examinations referenced by Dr. Dvorak but not included in Rizzi's submissions. Rizzi's attorney assured Hartford it had all information for the administrative appeal. Finally, the administrative appeal decision letter again identified the definition of disabled and discussed all information in the medical file, including Rizzi's subjective complaints. While Rizzi claims Hartford failed to provide her the resumes of Drs. Dibble and Siegel, she does not explain how this information would qualify for mandatory disclosure under the relevant regulations.[25] In short, we detect no regulatory violation.

_____

[24] Documents cited included Quan's "Attending Physician Statement," a "telephonic interview with [Rizzi], Rizzi's "Continuation of Disability Statement taken . . . on 4/25/06" (the statement she created with the investigator), "Medical records from Dr. Richard Dvorak . . . through 3/16/06," and a "Fax communication from Dr. Dvorak dated 5/17/06." (Appellant's App., Vol. II Rizzi Rec. at 133-34.)

[25] Indeed, when asked for Dr. Siegel's curriculum vitae, Hartford informed Rizzi's attorney it "do[es] not have that information and you need to contact [UDC] directly."

Rizzi argues she was denied her right to reply to Dr. Siegel's record review on appeal. In *Metzger v. Unum Life Ins. Co. of Am.*, we held:

> [The regulations do] not require a plan administrator to provide a claimant with access to the medical opinion reports of appeal-level reviewers prior to a final decision on appeal. Instead, the regulations mandate provision of relevant documents, including medical opinion reports, at two discrete stages of the administrative process. First, relevant documents generated or relied upon during the initial claims determination must be disclosed prior to or at the outset of an administrative appeal. Second, relevant documents generated during the administrative appeal-along with the claimant's file from the initial determination-must be disclosed after a final decision on appeal. So long as appeal-level reports analyze evidence already known to the claimant and contain no new factual information or novel diagnoses, this two-phase disclosure is consistent with full and fair review.

476 F.3d 1161, 1167 (10th Cir. 2007) (quotations and citations omitted) (emphasis added); *see also Sage v. Automation, Inc. Pension Plan & Trust,* 845 F.2d 885, 893-94 (10th Cir. 1988) (holding a "full and fair review" under ERISA requires "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision") (quotations omitted).

Rizzi acknowledges *Metzger* but claims Dr. Siegel's recommendation was not identical to Dr. Dibble's and, thus, is new factual information to which she should be allowed to respond. Here, Rizzi knew all the facts considered by Hartford and Dr. Siegel. To that end, she had the opportunity to provide additional information to support her claim when she submitted her appeal and her claim rests on the information she then

---

(Appellant's App., Vol. II Rizzi Rec. at 194.)

submitted. "Permitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal . . . would set up an unnecessary cycle of submission, review, re-submission, and re-review." *Metzger*, 476 F.3d at 1166.

### III. CONCLUSION

Because our exhaustive consideration of Rizzi's complaints discerns no improprieties in Hartford's handling of Rizzi's claim for benefits, we see no way in which its inherent conflict of interest affected its denial of benefits. The reviews by independent physicians and the detailed consideration of all objective and subjective information, including medical reports in conjunction with surveillance evidence, reduced the bias arising from Hartford's conflict of interest and provided a reasonable basis for its decision.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge