**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 5, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

IAN C.; A.C.,

      Plaintiffs - Appellants,

v.

UNITEDHEALTHCARE
INSURANCE COMPANY,

      Defendant - Appellee.

------------------------------

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,

      Amicus Curiae.

No. 22-4082

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:19-CV-00474-HCN)**

Brian Smith King of Brian S. King P.C., Salt Lake City, Utah, for Plaintiffs - Appellants.

Amanda Shafer Berman of Crowell & Moring LLP, Washington, D.C. (Amy M. Pauli, Neil Nandi, and Samuel H. Ruddy of Crowell & Moring LLP, Washington, D.C., and Jennifer S. Romano of Crowell & Moring LLP, Los Angeles, California, with her on the brief) for Defendant - Appellee.

Tara Morrissey, U.S. Chamber Litigation Center, Washington, D.C.; Meaghan VerGow, O'Melveny & Myers LLP, Washington, D.C., filed an amicus curiae brief on behalf of Defendant - Appellee, for the United States of America.

Before **BACHARACH**, **PHILLIPS**, and **EID**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

This appeal arises from an action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, to challenge the denial of healthcare benefits through an employer-sponsored plan. Ian C., the plan participant, claimed coverage for his son, A.C., the beneficiary, to receive care at an inpatient residential treatment center, Catalyst Residential Treatment, for mental-health and substance-abuse issues. The plan authorized UnitedHealthcare Insurance Company (United), the claims fiduciary, to determine A.C.'s eligibility for benefits under the plan.[1] After initially covering A.C.'s treatment at Catalyst, United later denied coverage.

Ian C. internally appealed the adverse benefit determination, which United upheld on appeal. Ian C. then pursued his case against United in federal district court, where he alleged that United's denial violated his right to receive a "full and fair review" of his claim under 29 U.S.C. §§ 1133(2), 1104(a)(1).[2]

---

[1] United administered benefits for mental-health and substance-abuse services through its designee, United Behavioral Health. We refer to these entities collectively as "United."

[2] Ian C. and A.C. are both named plaintiffs on the complaint filed in the U.S. District Court for the District of Utah and are both named as appellants on the notice of appeal to this court. But for concision, we refer to the appellants collectively under the guise of "Ian C.," as the covered plan participant and parent of the claimed beneficiary.

Ian C. argued that United arbitrarily and capriciously denied benefits to A.C. by failing to address A.C.'s substance abuse as an independent ground for coverage, by determining that A.C.'s continued treatment at Catalyst was not medically necessary, by ignoring the opinions of A.C.'s medical providers, and by misapplying the appropriate level-of-care guidelines. United denied these claims, and the parties filed competing motions for summary judgment. Ruling on dual motions for summary judgment, the district court decided in favor of United. Ian C. now appeals the district court's ruling that United's decision to deny benefits was not arbitrary and capricious and complied with ERISA.

Exercising jurisdiction under 28 U.S.C. § 1291, we agree with Ian C. that United's decision to deny benefits was arbitrary and capricious. We hold that United's denial violated 29 U.S.C. § 1133(2) and the ERISA regulations that guarantee a "full and fair review" of claims raised under § 1132(a)(1)(B), and so we reverse.

**BACKGROUND**

I.    **Factual Background**

A.    **Ian C.'s Plan**

Ian C.'s employer-sponsored benefits plan provides that United may decide "whether [the] Benefit plan will pay for any portion of the cost of a health care service," "[i]nterpret Benefits and the other terms, limitations and exclusions set out in [the plan]," and "[m]ake factual determinations relating to Benefits." App. vol. 8, at 13. The plan covers services for mental health and

3

substance abuse, specifically treatment at a residential treatment facility. But even these ostensibly covered services must be "[m]edically [n]ecessary" for United to extend benefits. *Id.* at 40, 45. And only United, or its designee, may determine medical necessity at its discretion.

To determine which services are medically necessary, United follows level-of-care guidelines for each area of service that it covers. For example, the guidelines for Common Criteria and Clinical Best Practices (Common Criteria Guidelines) establish general standards for admission, continued coverage, and discharge at a residential treatment facility. United also has more specific guidelines tailored to services for mental health and substance abuse— guidelines for the Mental Health Residential Treatment Center (Mental Health Guidelines) and guidelines for Substance-Related Disorders (Substance Abuse Guidelines).

The Common Criteria Guidelines advise United to cover a beneficiary's admission to a residential treatment facility if "the member is eligible for benefits," and the "member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care." App. vol. 9, at 33–34. For United to cover "continued service," the Guidelines recommend that the "admission criteria continue to be met and active treatment is being provided." *Id.* at 34. And the Guidelines direct United to stop service and discharge the beneficiary when the "factors which led to admission have been addressed" and "the member can be safely transitioned to a less intensive

4

level of care." *Id.* at 35. The Mental Health Guidelines and Substance Abuse Guidelines incorporate the Common Criteria Guidelines by reference.

Ian C.'s plan also provides a process for appealing adverse benefit determinations. Upon receiving a claim denial, the plan allows Ian C. to appeal the decision to United within 180 days. United then assigns the decision to be reviewed by a "qualified individual . . . who was not involved in the prior determination." App. vol. 8, at 61. If the appeal is denied, then the decision is final and the internal appeals process is exhausted.

### B.    A.C.'s Treatment History

A.C. was seventeen when Catalyst admitted him for mental-health and substance-abuse treatment, but these problems had dogged him since childhood. A.C. was diagnosed with Attention Deficit Hyperactivity Disorder at age seven. This diagnosis put him on medication for the first time, which caused him to feel withdrawn and not like himself. A.C. struggled with schoolwork through elementary and middle school, which strained his relationship with his parents. At thirteen, clinical psychologist Dr. Walter Peacock diagnosed A.C. with Anxiety Disorder. Dr. Peacock began meeting regularly with A.C. and his family to manage A.C.'s anxiety and "unhealthy relationship" with his parents. App. vol. 3, at 52. This outpatient therapy proved unsuccessful. By high school, A.C. was habitually experimenting with drugs, including marijuana, cocaine, Xanax, and Klonopin, and drinking alcohol almost daily. These addictions

escalated during A.C.'s high school years, leading to an overdose in December 2015.

The overdose was a tipping point for A.C. Dr. Peacock attested that A.C.'s "pattern of behavior was growing more and more dangerous," making inpatient treatment the only viable option. *Id.* at 52, 53. And so, given A.C.'s persistent recalcitrance and unwillingness to participate in therapy, Dr. Peacock recommended to Ian C. and his wife that they admit A.C. to an inpatient wilderness program.

A.C. began treatment at one such program, Blue Fire Wilderness, on April 7, 2016. He was admitted for "Attention-Deficit/Hyperactivity Disorder," "Alcohol Use Disorder," and "Unspecified Depressive Disorder." *Id.* at 56. At Blue Fire, A.C. participated in group therapy sessions, which sometimes focused on drug use and addiction. Halfway through A.C.'s stay at Blue Fire, Dr. Jeremy Chiles conducted a psychological evaluation of A.C. Regarding A.C.'s substance-use history, Dr. Chiles noted that A.C. began drinking alcohol at fourteen, which devolved into daily alcohol use by his junior year in high school.[3] His evaluation states that A.C. had experimented with a slew of other drugs, including marijuana, LSD, Xanax, cocaine, codeine, hydrocodone, and mushrooms. *Id.* at 96. Dr. Chiles portrayed A.C.'s drug use as a coping

---

[3] Dr. Chiles stressed that "since [A.C.] was interviewed, he disclosed to his therapist at [Blue Fire] that his substance use involved the use of more drugs and was more regular than previously reported." App. vol. 3, at 96. When admitted to Catalyst, A.C. reported that he first used alcohol at age twelve.

6

mechanism for his mental-health struggles and stated that "[i]n spite of resolutions to change, [A.C.] is likely to act out again in the future." *Id.* at 102–03. Dr. Chiles diagnosed A.C. with "moderate to severe" cannabis use disorder and "moderate to severe" alcohol use disorder. *Id.* at 106. Because of that diagnosis, he "strongly recommended" that A.C. continue treatment at an inpatient residential facility with access to substance-use treatment. A.C. was discharged from Blue Fire on June 23, 2016.

The next day, A.C. was admitted to Catalyst. Catalyst's treatment plan listed five diagnoses as reasons for A.C.'s admission: (1) "Generalized anxiety disorder," (2) "Unspecified depressive disorder," (3) "Cannabis use disorder," (4) "Parent-child relational problems," and (5) "Alcohol use disorder." App. vol. 4, at 43. Though A.C. had been drug- and alcohol-free for eleven weeks when he arrived at Catalyst, due to his preceding stay at Blue Fire, Catalyst classified his cannabis use disorder and alcohol use disorder as "severe." *Id.* As a general requirement for A.C.'s treatment, Catalyst's plan stated that A.C. needed "a place where he can have a sustained amount of time in sobriety as his drug use was severe and daily." *Id.* The plan then laid out specific treatment goals related to A.C.'s cannabis use disorder. One goal was for A.C. to "demonstrate a clear understanding of the dynamics of substance dependence as they relate personally to [him]." *Id.* at 47. Another goal was for A.C. "to routinely identify situations and other factors that could pose a risk to [his] sobriety." *Id.*

To fulfill these treatment goals, Catalyst prescribed A.C. individual and group therapy, on top of providing him an environment away from drugs and alcohol. Catalyst's medical records show that A.C. completed this therapy, as directed by the treatment plan. During his treatment at Catalyst, A.C. experienced substance cravings and reported having "flashbacks of drinking." App. vol. 6, at 46.

### C.     United's Coverage

On June 24, 2016, the date of A.C.'s admission to Catalyst, Ian C. submitted a request for coverage to United. In response, United completed an "Initial Facility-Based Review," to determine A.C.'s eligibility for benefits. App. vol. 7, at 189. United's intake form states that, though substance abuse was not a "primary driver" for A.C.'s admission to Catalyst, the "precipitant" for his admission was a "risk for relapse on drugs and alcohol" and "[i]nadequate relapse prevention strategies." *Id.* at 192, 193. And the form specifies that A.C. was admitted to treat his use of alcohol, Xanax, cannabis, and cocaine. *Id.* at 194. The intake lists "Generalized anxiety d/o" as A.C.'s primary diagnosis, and lists "Persistent depressive d/o," "Oppositional defiant d/o," "Alcohol use d/o," "Cannabis use d/o," and "Attention-deficit/hyperactivity" as additional diagnoses. *Id.* at 191. Noting these collective diagnoses and applying the Mental Health Guidelines, United approved benefits for A.C. to receive four days of residential treatment at Catalyst.

8

After the initial four days elapsed, United revisited A.C.'s eligibility. Upon review, United approved A.C. for four additional days at Catalyst because his symptoms were "not manageable in a less restrictive setting." *Id.* at 203–04. United documented A.C.'s mental state as "anxious, restless, irritable, depressed," and "sad," and added that A.C. was "having high cravings for using." *Id.* at 204. Four days later, United conducted another review and authorized another three days of coverage. This time, United reported that A.C. was experiencing "craving for substances," feeling "anxious," "depressed," "isolat[ed]," and suffering visual hallucinations.[4] *Id.* at 213. Three days later, United reassessed A.C.'s condition and his eligibility yet again. United found that A.C. was "restless," "telling therapist[s] what they want[ed] to hear," and "professing sobriety despite [his] long [history] of drug use," which led United to conclude that A.C.'s symptoms, once again, could not be treated in a "less restrictive setting." *Id.* at 219, 221.

This litany of short-lived extensions brings us to July 7, 2016. By that time, A.C. had received two weeks of treatment at Catalyst, which United covered. Then, Ian C. requested United to cover another thirty days. This time,

---

[4] United's internal notes for this extension show that the reviewer used the "LOC SA Residential rehabilitation" guidelines to evaluate A.C.'s eligibility for benefits. App. vol. 7, at 214. This notation indicates that the reviewer used the "level of care" guidelines for "substance abuse" to assess coverage, which differs from all the other reviews that used the "LOC MH Residential treatment" guidelines, or rather, the Mental Health Guidelines. *E.g.*, *id.* at 28, 197, 205, 222. United's one-time use of the Substance Abuse Guidelines is not mentioned by either party, so we will not discuss it further.

United declined the request. In fact, United not only rejected Ian C.'s request for a thirty-day extension, but it also denied coverage for A.C.'s residential treatment moving forward and recommended that he be discharged to intensive outpatient therapy. United based this decision on the Mental Health Guidelines, determining that "the treatment being recommended" for A.C.'s general anxiety disorder did "not appear to be consistent with generally accepted standards of medical practice." *Id.* at 233. United's internal-review notes accompanying its recommendation show that A.C. was still reporting cravings and had experienced a "flash back of drinking" two days earlier that "triggered him." *Id.* at 230.

### D.    Level One Denial

United sent its decision to deny coverage to a peer reviewer, Dr. Sheryl Jones, to corroborate or challenge its determination. To assess the claim, Dr. Jones reviewed United's internal notes on A.C.'s case, called "Linx Case Notes," and interviewed a designee from Catalyst. Using this information and applying the Mental Health Guidelines, Dr. Jones affirmed United's adverse benefit determination. She found that A.C.'s continued treatment at Catalyst was not covered by the plan because his treatment no longer met the "Medical Necessity Criteria." *Id.* at 238–39. This decision became effective July 8, 2016.

Dr. Jones sent a letter to Ian C. notifying him that A.C.'s benefits from July 8, 2016 forward had been denied. *See* 29 U.S.C. § 1133(1). This letter, dated July 12, 2016, provides that "[a]fter speaking with the facility designee,

10

it seems that your child has made progress and that his condition no longer meets guidelines for coverage of treatment in this setting." App. vol. 3, at 23. Though Dr. Jones acknowledged that A.C. was admitted partially for "treatment of substance use," she expounded that A.C. did "not have serious withdrawal or post-acute withdrawal symptoms" that would justify continued coverage. *Id.*

### E.    Level Two Denial

After receiving Dr. Jones's letter, Ian C. invoked his right to appeal under the plan. He authored a "Level One Member Appeal," dated January 4, 2017, challenging Dr. Jones's decision on several grounds. *Id.* at 4–17. Most saliently, he argued that Dr. Jones neglected to apply the Substance Abuse Guidelines along with the Mental Health Guidelines. He also accused Dr. Jones's letter of violating ERISA regulations, which require plan administrators to furnish "specific references in the medical records relied upon in reaching their conclusion." *Id.* at 7, 8.

Ian C.'s appeal stressed the severity of A.C.'s substance abuse and attested that outpatient therapy had been powerless to treat A.C.'s addictions in the past. He urged the next reviewer to reassess A.C.'s claim under the Substance Abuse Guidelines, which supported his position that A.C. was not ready to be discharged from an inpatient facility. Ian C. provided the next reviewer with several documents to consider with his appeal. He included in the body of his appeal an excerpted reference letter from Dr. Peacock, A.C.'s child psychologist, and excerpted medical records from Catalyst. Attached to the

appeal letter, Ian C. appended A.C.'s medical records from Blue Fire, a medication disclosure form, Dr. Chiles's evaluation, and more medical records from Catalyst.

United assigned Dr. Cheryl Person to conduct the second review of Ian C.'s claim. According to the plan, Dr. Person was a licensed psychiatrist who was uninvolved in the initial adverse benefit determination. After reviewing Ian C.'s "appeal letter, case notes, medical records and [the Mental Health Guidelines]," Dr. Person upheld Dr. Jones's denial of benefits. App. vol. 7, at 42.

Dr. Person officially communicated her decision to Ian C. in a denial letter dated January 19, 2017.[5] The letter explained that because A.C. "had made progress," "was not endangering the welfare of himself or others," "was attending and participating in programming," and "was tapered off his antidepressants as his mood was stable," he no longer met the criteria for coverage under the Mental Health Guidelines. *Id.* at 42–43. Dr. Person noted that A.C. was admitted to Catalyst for "General Anxiety Disorder," without mentioning his substance-abuse-related diagnoses. *Id.* at 42. She identified A.C.'s "remaining symptoms," as "parental-child conflict," which she deduced could be treated "in a less restrictive setting." *Id.* at 43.

---

[5] A.C.'s provider notified United that it did not receive Dr. Person's letter, and so United issued a second copy dated March 31, 2017. There is no substantive difference between the two versions.

12

Upon receiving Dr. Person's letter, Ian C. had exhausted the internal appeals process available to him under the plan. And so, he invoked his right to sue United in federal district court. *See* 29 U.S.C. § 1132(a)(1)(B).[6]

## II.     Procedural Background

On July 5, 2019, Ian C. filed a complaint against United seeking (1) recovery of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B); and (2) injunctive relief. He voluntarily dismissed the second claim with prejudice in a stipulated motion. Ian C. and United then filed motions for summary judgment on the ERISA claim. On August 11, 2022, the district court granted summary judgment for United and entered judgment the same day. This timely appeal followed.

## III.     Standard of Review

### A.     Summary Judgment

"Where, as here, the parties in an ERISA case both moved for summary judgment, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the nonmoving party is not entitled to the usual inferences in its favor." *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up).

---

[6] Section 1132(a)(1)(B) empowers a plan participant to bring a civil action against the plan administrator "to recover benefits due to him under the terms of his plan" or "to enforce his rights under the terms of the plan."

13

Because the parties dispute the proper standard of review, we address that issue first.

## B.    ERISA Review Standards

Typically, we review motions for summary judgment de novo. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Dish Network, LLC*, 17 F.4th 22, 29 (10th Cir. 2021). But ERISA cases are a horse of a different color. In the ERISA context, we proceed de novo *unless* the plan authorizes the administrator to determine benefits on a discretionary basis, in which case we apply the more deferential arbitrary-and-capricious review standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (establishing the standard of review for § 1132(a)(1)(B) appeals).

Ian C.'s plan grants United authority to interpret the terms of the plan and make discretionary benefits decisions. This would suggest arbitrary-and-capricious review. *See Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011); *Firestone*, 489 U.S. at 115. But Ian C. argues that we should review his appeal de novo because United failed to "substantially comply" with ERISA's procedural requirements.[7] *See Hancock v.*

---

[7] The substantial-compliance rule was born out of a desire to avoid a "hair-trigger" rule that would divest plan administrators of their deference to make benefits decisions for trivial infractions of ERISA's requirements. *See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 799 (10th Cir. 2010); *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan*, 379 F.3d 1168, 1173–74 (10th Cir. 2004). Instead, we withhold judicial deference only

(*footnote continued*)

*Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 (10th Cir. 2009) ("[D]e novo review

may be appropriate if the benefit-determination process did not substantially

comply with ERISA regulations . . . ."). And more broadly, owing to the

Department of Labor's 2002 and 2011 amendments to the ERISA regulations,

Ian C. proposes that we adopt de novo review for all cases in which

administrators fail to "strictly adhere[]" to ERISA regulations. Op. Br. at 15,

16, 17, 19 (first quoting 29 C.F.R. § 2560.503-1(a) ("2002 regulations"); and

then quoting 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(*1*)-(*2*) ("2011

regulations")). United and the United States Chamber of Commerce, amicus

curiae, argue that the default arbitrary-and-capricious review standard should

remain. We agree.

The Supreme Court created the default deferential-review standard for

ERISA claims in *Firestone*, 489 U.S. at 115. The Court reasoned that judicial

deference to decisions issued by plan administrators was appropriate because

"ERISA abounds with the language and terminology of trust law," which

traditionally accords deference to the discretionary exercise of fiduciary duties.

---

when administrators fail to show a "valid exercise" of their discretion. *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003) (addressing the case when "the administrator's 'deemed denied' decision is by operation of law rather than the exercise of discretion"). Otherwise, administrators are considered in "substantial compliance" with ERISA, and thus deserving of judicial deference. *See id.* at 636 (explaining that substantial compliance requires the administrator to be engaged in "an ongoing productive evidence-gathering process in which the claimant is kept reasonably well-informed").

*Id.* at 110–11. The Court has faced multiple opportunities to overturn or otherwise tweak *Firestone* deference; and in every instance, it has declined. *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (reaffirming the role *Firestone* deference plays in preserving ERISA's "careful balancing" between beneficiaries' rights and administrators' interests (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004))); *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (reexamining and upholding *Firestone* deference even when the administrator had a conflict of interest). In fact, in *Glenn*, the Court expressly repudiated the prospect of "near universal review by judges *de novo* . . . of the lion's share of ERISA plan claims denials." 554 U.S. at 116.

Nothing in Ian C.'s brief convinces us to stir the pot.[8] First and foremost, his argument assumes that the Department of Labor's ERISA regulations can, or should, dictate our judicial standards of review. That is a flawed premise. Congress delegated authority to the Secretary of Labor to enact procedural regulations to enforce ERISA's policies, but that authorizing legislation never

[8] In *Kellogg v. Metropolitan Life Insurance Co.*, we addressed a similar argument about the 2002 regulations' impact on the substantial-compliance rule. 549 F.3d 818, 828 (10th Cir. 2008) (entertaining the idea that the 2002 ERISA regulations "called into question the continuing validity of the substantial compliance rule"). But there, we declined to decide the issue because the administrator's violation of ERISA deadlines was so egregious and blatant that there was "little doubt" the administrator had failed to comply with ERISA's requirements, substantially or otherwise. *See id.*; *see also Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316–17 (10th Cir. 2009) (declining to extend deference because AIG supplied no "good faith" justification for its repeated violations of ERISA-mandated deadlines).

mentioned judicial standards of review. *See* 29 U.S.C. § 1135 (authorizing the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter"). Congress intentionally left ERISA's standard of review open to the judiciary's interpretation, which the Supreme Court duly supplied in *Firestone*. *See Glenn*, 554 U.S. at 116 (perceiving that Congress "left to the courts the development of review standards" for ERISA actions).

Second and more practically, because United cannot surmount arbitrary-and-capricious review, it would be fruitless for us to proceed de novo. *See, e.g., David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 n.11 (10th Cir. 2023) (dispensing with de novo review even when it was appropriate because "[United's] adverse benefits determination fail[ed] . . . an arbitrary and capricious standard of review"). Thus, this case is not an appropriate vehicle for us to reevaluate our standard of review.

## C.    Arbitrary-and-Capricious Review

Our review goes to the plan administrator's decision, not the district court's. *See Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009)). We review the plan administrator's decision for arbitrariness and capriciousness. *Id.*

"Under arbitrary and capricious review, this court upholds [the administrator's] determination so long as it was made on a reasoned basis and

17

supported by substantial evidence." *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018); *see Foster*, 693 F.3d at 1231–32 (clarifying that, in the ERISA context, we treat "the abuse-of-discretion standard and the arbitrary-and-capricious standard as interchangeable" (cleaned up)). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (cleaned up). And as we consider "whether the evidence in support of the administrator's decision is substantial, we must take into account whatever in the record fairly detracts from its weight." *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).

When issuing an adverse benefit determination, an administrator must provide the participant "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). After the administrator issues an adverse benefit determination, the participant is entitled to a "reasonable opportunity" for a "full and fair review" of the decision. *Id.* § 1133(2). A "full and fair review" discloses to the participant the "evidence the decision-maker relied upon." *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)). Our review is limited to "those rationales that were

18

specifically articulated in the administrative record as the basis for denying a claim." *Spradley v. Owens-Illinois Hourly Empls. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *overruled on other grounds by Glenn*, 554 U.S. at 128, *as recognized in Holcomb*, 578 F.3d at 1192–93).

Recently, in *D.K. v. United Behavioral Health*, we held that the administrator must include its reasons for denying coverage in the four corners of the denial letter. 67 F.4th at 1239 ("ERISA denial letters play a particular role in ensuring full and fair review. ERISA regulations require that denial letters be comprehensive and include . . . specific reasons for the denial." (citing 29 C.F.R. § 2560.503-1(f)(3), (h)(3)–(4))). Under *D.K.*, our analysis focuses on the two denial letters United furnished to Ian C., the first from Dr. Jones communicating the initial denial decision, but more critically the second from Dr. Person affirming the denial on appeal.[9]

---

[9] *D.K.* established that our review of an administrator's benefits denial is confined to the denial letters. *See* 67 F.4th at 1239. Though United sent two denial letters, Dr. Person's letter pulls focus because Ian C. appeals based on an independent-ground-for-coverage theory. After Ian C. received the initial denial from Dr. Jones, he specifically raised substance abuse as an independent ground for coverage for the next reviewer to consider. As the second reviewer, Dr. Person was uniquely positioned to respond to Ian C.'s appeal, and so her letter is all important.

## DISCUSSION

Ian C. argues that United's denial of benefits for A.C.'s treatment at Catalyst, effective July 8, 2016, was arbitrary and capricious because United overlooked A.C.'s substance abuse as an independent ground for coverage. Ian C. challenges United's view that A.C.'s substance abuse was in any way "secondary" to his mental-health condition. Op. Br. at 27. According to Ian C., substance abuse was central to A.C.'s treatment, and therefore, United needed to address that portion of his condition when it denied benefits. Ian C. additionally rejects United's citations to its internal notes, peer reviews, and other portions of the record to support its argument that A.C.'s substance abuse was taken into account during the review process. He maintains that United cannot "paper over the deficiencies in its denial letters" with reasoning and citations to parts of the record that it never communicated to him. *Id.* at 26.

## I.     Independent Ground for Coverage

Ian C.'s main argument on appeal is that United disregarded A.C.'s substance abuse as an independent ground for coverage under the plan. This court addressed the independent-ground-for-coverage theory most notably in *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792 (10th Cir. 2004). *Gaither* examined the case of a man caught in a Catch-22: the prescription painkillers he took to manage severe chronic pain made him unable to work, according to his employer, and at the same time ineligible to receive disability benefits, according to his health plan administrator. *Id.* at 798, 799. Gaither insisted that

20

his reliance on the painkillers prevented him from performing his job, and thus that he qualified for disability benefits. *Id.* at 800. He appealed the administrator's denial of benefits to that effect. *Id.* But the administrator reaffirmed the denial based on Gaither's failure to prove that he suffered from a psychological anxiety disorder, meanwhile "overlook[ing] [his] signs of a potential drug use problem." *Id.* at 802.

We observed that Gaither had "specifically raised" his use of painkillers as "another independent ground for disability," and that the administrator "did not have substantial evidence about the extent or effects" of his drug use sufficient to contradict his claim. *Id.* at 806. Yet the administrator denied coverage without considering Gaither's drug use as an independent ground for coverage. *Id.* And so, we held that the administrator acted arbitrarily and capriciously by shutting its eyes to evidence that supported Gaither's "theory of entitlement." *Id.* at 807 ("[W]e assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory."). From a policy perspective, we emphasized that administrators, as fiduciaries, have a "duty to see that those entitled to benefits receive them." *Id.* at 807–08. This process requires a "meaningful dialogue" between both parties to unearth all the relevant evidence surrounding the participant's claim and to guarantee that benefits are distributed according to the plan. *Id.* at 807 (quoting

21

*Gilbertson*, 328 F.3d at 635). Finding the administrator's cooperation in those efforts lacking, we reversed the district court's decision that the administrator's denial wasn't arbitrary and capricious. *Id.* at 809.

Similarly, in *David P. v. United Healthcare Insurance Co.*, we affirmed the district court's ruling against United because United overlooked the beneficiary's substance abuse as an independent ground for coverage separate from her mental-health treatment at a residential treatment center.[10] 77 F.4th at 1309 (citing *Gaither*, 394 F.3d at 806). Not only was there evidence in the record that the patient had been receiving treatment for both conditions, but the administrative appeal specifically identified substance-abuse treatment as an independent ground for coverage. *Id.* at 1310. Despite having raised the issue, United neglected to address substance abuse in its ultimate adverse benefits determination. *Id.* (concluding that the reviewer's passing reference to "addiction" was not enough because "even then that reviewer did not separately state why [the beneficiary's] substance abuse treatment did not warrant coverage"). Based on that omission, we affirmed the district court's decision against United. *Id.* at 1316–17.

Here, after Dr. Jones initially denied benefits for A.C.'s treatment at Catalyst as of July 8, 2016, Ian C. appealed. In his appeal, Ian C. faulted Dr.

---

[10] Ian C. filed a Federal Rule of Appellate Procedure 28(j) letter alerting this court to *David P.*'s issuance. The letter asserted that *David P.* offered additional support for the argument that United cannot rely on its internal notes to justify the benefits denial.

Jones for evaluating A.C. solely under the Mental Health Guidelines without considering the Substance Abuse Guidelines too. He insisted that United's review needed to apply this "dual criteria" because A.C. was "dually diagnosed." App. vol. 3, at 5, 6. His letter expressed concern that A.C.'s "release from treatment would assuredly lead to relapse" because A.C.'s residence at Catalyst was the only thing keeping him sober. *Id.* at 7. And to support these claims, Ian C. appended a bevy of evidence for the second reviewer to consider with his appeal, including the Substance Abuse Guidelines.

But Dr. Person affirmed Dr. Jones's adverse benefit determination without mentioning any of the evidence or arguments that Ian C. raised. Citing the Mental Health Guidelines, Dr. Person denied benefits because A.C.'s "General anxiety disorder" no longer required "24-hour nursing care or supervision provided at this level of care" and because he had "made progress." App. vol. 7, at 42, 43. She listed A.C.'s only remaining symptom as "parent-child conflict," which she determined was treatable in a "less restrictive setting." *Id.* at 43. Dr. Person's denial letter made no substantive mention of A.C.'s substance abuse, the Substance Abuse Guidelines, or the evidence Ian C. submitted with his appeal. Ian C. contends that Dr. Person's denial was arbitrary and capricious because she tacitly rejected A.C.'s substance abuse as an independent ground for coverage.

23

Arbitrary-and-capricious review of the administrator's appeal process is not "without meaning." *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018) (unpublished). This court established in *Gaither* that, when reviewing adverse benefit determinations, the fiduciary must consider an independent ground for coverage that the claimant raises during the appeal. 394 F.3d at 807; *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence . . . ."). To be sure, this rule applies only when the administrator has "little or no evidence in the record to refute" the claimant's ground for recovery. *Blair v. Alcatel-Licent Long Term Disability Plan*, 688 F. App'x 568, 577 n.11 (10th Cir. 2017) (unpublished) (quoting *Gaither*, 394 F.3d at 807) (discussing "the *Gaither* rule"). But that is the case here.

This record is replete with evidence of A.C.'s substance abuse and the treatment he received for it at Catalyst. Catalyst's therapists noted that A.C. experienced "flashbacks of drinking" days before United cancelled coverage. App. vol. 6, at 46. The facility marked his cannabis use disorder and alcohol use disorder as "severe," even though A.C. hadn't used drugs or alcohol for weeks. App. vol. 4, at 43. Catalyst noted that A.C. needed to be somewhere he could enjoy "a sustained amount of time in sobriety" because his addictions were so severe. *Id.* Likewise, Dr. Chiles's and Dr. Peacock's accounts of A.C.'s substance-use history underscore the severity of A.C.'s addictions and recount

that his previous attempts at outpatient therapy were ineffective. And even United's internal paperwork acknowledges that A.C. was at Catalyst to receive treatment for alcohol, Xanax, cannabis, and cocaine.

On this record, United was not justified in shutting its eyes to the possibility that A.C. was entitled to benefits based on his substance abuse. *Compare David P.*, 77 F.4th at 1310 (noting that "it was clear from the record before" United that the claimant was being treated for substance abuse); *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 23 (4th Cir. 2014) (concluding that because "the record did not refute [the claimant's] claim of disability" and the claimant presented "a close case" for recovery, the administrator's denial was arbitrary and capricious), *with Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 216 (2d Cir. 2015) (deciding that the administrator's denial was not arbitrary and capricious because the claimant's "evidence taken alone was inadequate to support his claim"); *Rizzi v. Hartford Life & Accident Ins. Co.*, 383 F. App'x 738, 752 (10th Cir. 2010) (unpublished) (determining that the administrator was not required to consider the purported ground for coverage because the claimant failed to submit "any tangible evidence" supporting the claim). And so, we agree that Dr. Person's complete erasure of A.C.'s substance abuse, after Ian C. specifically raised it as an independent ground for coverage in his appeal, was arbitrary and capricious.

United attempts to distinguish this case from *Gaither* by claiming it followed up on "obvious leads" pointing to A.C.'s substance abuse through its

25

conversations with Catalyst staff. Resp. Br. at 52–53. United contends that despite the evidence acquired from those inquiries, the reviewers concluded A.C.'s continued treatment at Catalyst was not "medically necessary." *Id.* at 53. This argument misplaces *Gaither* in the canon of ERISA-benefits-denial cases. *Gaither* dealt with independent grounds for coverage, not medical necessity.[11] *See* 395 F.3d at 806. Our focus is on the independent ground for coverage. If an administrator's decision ignores an independent ground for coverage and there is scant evidence to refute the claimant's theory, then the decision fails arbitrary-and-capricious review. *See id.* (determining that the administrator "rejected [Gaither's] claim without a substantial basis for doing so" because it "did not have substantial evidence" about the condition that provided his independent ground for coverage); *David P.*, 77 F.4th at 1310 (reversing the denial of coverage because United "fail[ed] to address [the beneficiary's] substance abuse treatment as an independent ground for coverage" even though her receipt of such treatment was "clear from the record").

---

[11] In his opening brief to this court, Ian C. stipulates that "[b]ecause the district court's decision cannot stand," he does not address the arguments he made before the district court "that A.C.'s treatment at Catalyst was medically necessary, that United abused its discretion by not engaging with A.C.'s treating professionals' opinions and not articulating how it applied the terms of the Plan and internal guidelines to A.C.'s medical history." Op. Br. at 13 n.4. Neither does he "address these rulings on appeal." *Id.*

In district court, Ian C.'s argument about medical necessity was that United had failed to consider A.C.'s medical records and medical history. *See* App. vol. 1, at 113–18. His waiver of that argument does not prevent him from arguing here (as he does) that United overlooked A.C.'s substance abuse as an independent ground for coverage.

## II.    ERISA

This result tracks ERISA's statutes and regulations. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(h)(2)(iv). Under ERISA, after the administrator issues an adverse benefit determination, the claimant is entitled to a "full and fair review by the appropriate named fiduciary." Section 1133(2). This review must include a "meaningful dialogue" between the claimant and the administrator, which requires "an ongoing, good faith exchange of information" to ensure that the terms of the plan are applied accurately and the benefits are dispensed fairly. *Gilbertson*, 328 F.3d at 635; *see Gaither*, 394 F.3d at 807–08 ("While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them."). A "good faith exchange of information" presumes that the administrator will consider any relevant evidence in the shared record between the parties that supports the claimant's receiving benefits. *Gilbertson*, 328 F.3d at 635; *see Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1120 (10th Cir. 2006) (requiring that administrators reviewing a benefits denial "take into account whatever in the record fairly detracts from [the decision's] weight" (quoting *Caldwell*, 287 F.3d at 1282)); *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1167 (10th Cir. 2007) (recognizing that ERISA appeals may only "analyze evidence already known to the claimant").

To guarantee a "full and fair review" on appeal, the administrator must reevaluate the claim on a clean slate. ERISA regulations prohibit the second

27

reviewer from showing any deference to the first reviewer—a rare case when the appealing party gets a true second bite at the apple. 29 C.F.R. § 2560.503-1(h)(3)(ii). And the second reviewer must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim," even if those materials were unavailable to the first reviewer. *Id.* § 2560.503-1(h)(2)(iv). This scheme holds the administrator accountable to interpret the plan "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i); *see Rasenack*, 585 F.3d at 1324 ("An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." (citation omitted)); *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1206–07 (10th Cir. 2019) (clarifying that fiduciary obligations trigger when the fiduciary exercises their discretionary authority); *Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 541 (7th Cir. 2018) (emphasizing that the administrator's interpreting benefits under the plan constitutes "a fiduciary act" (citation omitted)).

At minimum, Dr. Person was required to address Ian C.'s arguments and evidence of A.C.'s substance abuse, the Substance Abuse Guidelines, and the relevant provisions of the plan to provide a "full and fair review." *See* 29 C.F.R. § 2560.503-1(h)(2)(iv) (requiring the administrator to "[p]rovide for a review that takes into account all comments, documents, records, and other information admitted by the claimant relating to the claims"); *see, e.g., Hancock*, 590 F.3d at 1154 (holding that MetLife's denial letter satisfied "full

and fair review" because it cited the relevant plan provision, "summarized MetLife's reasons for denying the claim and the first appeal," and then explained that the claimant's evidence "did not demonstrate with certainty" her stated grounds for recovery). But her letter is silent on A.C.'s substance abuse. By obscuring A.C.'s substance abuse and focusing solely on his mental-health treatment, United failed to "take[] into account all . . . information submitted by the claimant," in violation of ERISA. 29 C.F.R. § 2560.503-1(h)(2)(iv). In doing so, United rebuffed its fiduciary duties and denied Ian C. his right to a "full and fair review." *See* 29 U.S.C. §§ 1133(2), 1104(a)(1).

## III.    United's Remaining Arguments[12]

United argues that Dr. Person didn't need to address substance abuse in her denial letter because substance abuse was not a "primary driver" for A.C.'s admission to Catalyst. Resp. Br. at 45 (citing App. vol. 7, at 199, 208, 216, 225). United's emphasizing the "primary driver" for A.C.'s admission is an invention of creative lawyering. We have never used this language or placed any weight on the "primary driver" for a beneficiary's treatment. Whether substance abuse was a predominant or subordinate factor to A.C.'s admission is irrelevant, so long as it could have served as an independent ground for

---

[12] Our caselaw instructs us to reject many of the arguments that United makes on appeal because United did not rely on them in its denial letters to Ian C. *See D.K.*, 67 F.4th at 1239; *Spradley*, 686 F.3d at 1140. But for completeness, we review each one in turn. As it happens, none of these arguments would change our decision.

coverage. *See Gaither*, 394 F.3d at 806. And we know that it could have because Ian C.'s plan covers services for substance-abuse treatment at residential treatment facilities like Catalyst. At any rate, United's "primary driver" argument is overstated because United's reviewers listed the "risk for relapse on drugs and alcohol" as the "precipitant" for his admission, which is hardly distinguishable from the "primary driver."

United next argues that Catalyst was not "actively treat[ing]" A.C. for substance abuse. *Id.* at 47. The record belies this assertion. Catalyst diagnosed A.C. with "severe" alcohol use disorder and cannabis use disorder as two of the five causes for his admission. App. vol. 4, at 43. It also prescribed individual and group therapy to treat A.C.'s cannabis use disorder, which the evidence shows he completed. But most of all, A.C.'s residence at Catalyst was itself part of the treatment because A.C. required "a place where he can have a sustained amount of time in sobriety as his drug use was severe and daily." *Id.* United's claim is disingenuous because its own notes from reviewing A.C.'s benefits eligibility repeatedly mark, "Yes," next to the question asking whether A.C. was, "Admitted to treat this substance?"—referring to alcohol, Xanax, cannabis, and cocaine. *E.g.*, App. vol. 7, at 194, 200, 209. Thus, United's records undermine its own argument.

United also claims that continued coverage for A.C.'s treatment at Catalyst was not medically necessary because he was not experiencing symptoms of withdrawal. United argues that Catalyst is "not a 12 step program"

30

and A.C.'s medical records lacked toxicology reports or drug monitoring, demonstrating that Catalyst was "not actively treat[ing]" A.C. for substance abuse.[13] Resp. Br. at 47. These points are unavailing. This court is not a treatment expert; Catalyst is the expert. Catalyst created an individualized plan to treat A.C.'s severe cannabis use disorder, and the evidence shows that the plan was followed. We have no reason but to conclude that Catalyst was treating A.C. for substance abuse when United revoked coverage on July 8, 2016.

Next, United maintains that Dr. Person's evaluation of A.C. under the Mental Health Guidelines was sufficient without equal consideration of the Substance Abuse Guidelines. United contends that both Guidelines contain "nearly identical requirements," making a dual review superfluous. *Id.* at 62. United reminds us that the plan covers only "medically necessary" services, adding that those services do not distinguish between mental-health and substance-use treatments.

We disagree that the Mental Health Guidelines and Substance Abuse Guidelines are "nearly identical." Though both Guidelines require the reviewer to consider "[c]o-occurring behavioral health and medical conditions," the

---

[13] Though Catalyst is not a 12-step program, we observe that A.C.'s residence there implicitly prevented him from using drugs or alcohol. Also, A.C.'s parents were referred to "Al Anon," a program for family members of those suffering from alcohol addiction. App. vol. 7, at 237; *see* AL-ANON FAM. GRPS., https://perma.cc/AL57-5WK3.

Substance Abuse Guidelines go one step further. Substance Abuse Guidelines section 1.3.1 states that administrators should consider the risk of relapse before discharge, specifically when "[a] co-occurring mental health condition is stabilizing *but the remaining signs and symptoms are likely to undermine treatment in a less intensive setting*." App. vol. 3, at 43 (emphasis added). This provision militates against discharging a patient with substance abuse if the relapse risk is high, even when the patient's mental health is improving. By disregarding this provision of the Substance Abuse Guidelines, Dr. Person ignored the possibility that outpatient treatment would expose A.C. to a greater risk of relapse despite his other "progress." App. vol. 7, at 32. Ian C. flagged this concern in his appeal letter, bolstered by Dr. Peacock's letter and Dr. Chiles's psychological evaluation, and yet Dr. Person ignored it. App. vol. 3, at 7 (urging that A.C.'s "release from treatment would assuredly lead to relapse").

Even worse, the one remaining symptom Dr. Person identified for A.C. was "parent-child conflict." App. vol. 7, at 32. She calculated that this could be treated adequately in a "less restrictive setting." *Id.* But Dr. Chiles's evaluation tethered A.C.'s "maladaptive pattern of alcohol and other drug use" directly to A.C.'s perceived "conflict within his home" and his tumultuous relationship with his parents. App. vol. 3, at 102. Not only was A.C.'s relationship with his parents a trigger for his drug use, but the record also contained evidence that A.C. sometimes used drugs with his sister, who was a regular user herself. If

Dr. Person had considered this evidence under the Substance Abuse Guidelines, particularly section 1.3.1, then she may have been dissuaded from discharging A.C. into his home environment where he faced a heightened risk of relapse.

United rejoins that Ian C. bore the burden to prove A.C.'s entitlement to receive benefits under the Substance Abuse Guidelines and alleges that he failed to carry his burden. Because Ian C. never explains how the Substance Abuse Guidelines justify A.C.'s receiving benefits, United avows that the Guidelines cannot serve as the basis for us overturning the district court's decision. In support, United cites a single district court case, *Daniel B. v. United Healthcare*, No. 2:20-CV-00606, 2022 WL 4484622, at *13 (D. Utah Sept. 27, 2022) (unpublished). We are not bound by *Daniel B.*, and regardless we find it distinguishable because substance abuse was not a listed reason for the patient's admission to treatment, unlike this case. *See id.* In *Daniel B.*, the district court found that the patient was ineligible for benefits under the administrator's substance-related guidelines. *Id.* But here, our review of the record and the Substance Abuse Guidelines leads us to conclude that A.C. likely would have been eligible for benefits had Dr. Person faithfully applied the appropriate guidelines.

Finally, United insists that its reviewers' internal notes are properly a part of the administrative record for Ian C.'s claim. Our recent disposition in *D.K.* forecloses this argument. 67 F.4th at 1243 ("Review of the information provided to claimant may be appropriately limited to the denial letters."). Only

the rationales articulated to the beneficiary in the denial letter are eligible for review, both in the administrative appeal and before this court. *See id.* And though this litigation began before *D.K.*'s publication, our previous holdings put United on notice of this standard.[14] *See Spradley*, 686 F.3d at 1140 ("[T]he federal courts will consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim." (cleaned up)); *Flinders*, 491 F.3d at 1190 (same); *see also Sandoval*, 967 F.2d at 380 (reasoning that to allow the district court to review evidence that was not presented to both parties during the decision-making process would "seriously impair" the "primary goal of ERISA" to expeditiously resolve benefits disputes (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990))). United cannot avail itself of its peer-to-peer conversations with Catalyst staff, Linx case notes, and the like to defend its decision because these materials were not conveyed to Ian C. in the denial letters.[15] *See David P.*, 77 F.4th at 1313; *D.K.*, 67 F.4th at 1243.

---

[14] Ian C. filed a Rule 28(j) letter alerting this court to the newly issued *D.K.* opinion.

[15] United mischaracterizes the issue by claiming that we routinely rely on administrators' internal notes to uphold adverse benefit determinations, citing as an example *Tracy O. v. Anthem Blue Cross Life and Health Insurance*, 807 F. App'x 845, 854–55 (10th Cir. 2020). The point is not whether courts refer to administrators' internal records when deciding these cases. Rather, the concern is whether administrators rely on internal records and evidence to make benefits determinations and then withhold those reasonings from claimants. Our caselaw and ERISA regulations proscribe this practice. *See* 29 C.F.R. § 2560.503-1(g)(1)(i)–(iii) (requiring the initial denial letter to include "[t]he

*(footnote continued)*

Therefore, none of United's arguments dissuade us from concluding that it arbitrarily and capriciously denied A.C. benefits for his treatment at Catalyst and deprived Ian C. of his right to receive a "full and fair review" of his administrative appeal under 29 U.S.C. § 1133(2).

## CONCLUSION

For these reasons, we reverse the district court's finding that United's decision was not arbitrary and capricious and remand the case for further consideration consistent with this opinion.

---

specific reason or reasons for the adverse determination" and the "specific plan provision" the administrator used to make its decision); *David P.*, 77 F.4th at 1313; *D.K.*, 67 F.4th at 1242; *Spradley*, 686 F.3d at 1140.